IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, and UNITED STATES OF AMERICA, | ) ) ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY DEMAND |
| TRIDENT MORTGAGE COMPANY LP, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

## INTRODUCTION

1.      The Consumer Financial Protection Bureau (Bureau) and the United States of America (the United States) bring this action against Trident Mortgage Company LP (Trident) under the Fair Housing Act (FHA), 42 U.S.C. §§ 3601-3619, the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f, ECOA's implementing regulation (Regulation B), 12 C.F.R. pt. 1002, and the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. § 5536(a)(1)(A), to remedy discrimination in Trident's mortgage lending.

2.      The FHA and ECOA prohibit creditors, such as non-depository mortgage companies, from discriminating in home loans on the basis of race, color, national origin, and other characteristics. Under the FHA, it is unlawful to discriminate against any person in making available residential real estate-related credit transactions, in making available or denying a dwelling, and in the terms, conditions, or privileges of sale of a dwelling or the provision of services in connection with such a sale, on the basis of race, color, national origin, and other characteristics. 42 U.S.C. §§ 3604(a)-(b), 3605(a). ECOA and its implementing regulation,

Regulation B, 12 C.F.R. pt. 1002, make it unlawful for a creditor to discriminate against an applicant in any aspect of a credit transaction on the basis of race, color, national origin, or other prohibited bases. ECOA and Regulation B also prohibit any statements, acts, or practices that would discourage on a prohibited basis a prospective applicant from applying for credit. 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(b); 12 C.F.R. pt. 1002, Supp. I, ¶ 4(b)(1).

3.      From at least 2015 through 2019, Trident engaged in a pattern or practice of unlawful discrimination against applicants and prospective applicants, on the basis of race, color, or national origin, including by redlining majority-minority neighborhoods in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD Metropolitan Statistical Area (Philadelphia MSA), and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit. For the purposes of this Complaint, "minority" refers to people who identified as Black, Hispanic, Asian, Native American, Native Hawaiian, or Pacific Islander in the U.S. Census.

4.      "Redlining" is one type of discrimination prohibited under the FHA, ECOA and ECOA's implementing regulation, Regulation B. Redlining occurs when lenders deny or discourage applications by avoiding providing loans and other credit services in neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

5.      From at least 2015 through 2019, Trident engaged in a pattern or practice of unlawful redlining. As alleged in detail herein, Trident avoided providing home loans and other home mortgage services in majority-minority neighborhoods in the Philadelphia MSA. Trident thereby discriminated against applicants and prospective applicants living in, or seeking credit to purchase properties in, majority-minority neighborhoods in the Philadelphia MSA. Trident also engaged in acts or practices directed at applicants and prospective applicants that discouraged

those living in, or seeking credit to purchase properties in, these neighborhoods from seeking or applying for credit from Trident.

6.     From 2015 through 2019, Trident's practices included locating and maintaining nearly all its offices and all its loan officers in majority-white neighborhoods and avoiding having offices in—or having loan officers serve—majority-minority areas. Trident also concentrated its outreach, advertising, and marketing in majority-white neighborhoods and avoided marketing to majority-minority areas. As a result of these practices, Trident discouraged applicants and prospective applicants, generating disproportionately low numbers of loan applications and home loans from majority-minority neighborhoods in the Philadelphia MSA compared to similarly situated lenders.

7.     Trident's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-minority neighborhoods, and otherwise discouraged those individuals from applying for home loans on the basis of the race, color, or national origin of the residents of those neighborhoods. Trident's conduct was not justified by a legitimate, non-discriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action because it is brought under federal laws, 12 U.S.C. § 5565(a)(1); 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h), presents a federal question, 28 U.S.C. § 1331, and is brought by the United States and an agency of the United States, 28 U.S.C. § 1345.

9.     Venue is proper in the Court under 28 U.S.C. § 1391 and 12 U.S.C. § 5564(f),

because Trident conducts business in, and a substantial part of the events or omissions giving rise to the claims occurred in, this judicial district.

## PARTIES

10.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, including the authority to enforce the CFPA and ECOA. 12 U.S.C. §§ 5564(a)-(b), 5481(12)(D), (14).

11.     The United States brings this action to enforce the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

12.     Trident is a limited partnership incorporated in the State of Delaware and has locations in Delaware, New Jersey, and Pennsylvania. Between at least January 1, 2015 and December 31, 2020, Trident was a non-depository mortgage company licensed to originate mortgage loans in Delaware, New Jersey, and Pennsylvania. Trident was licensed to originate mortgage loans in Maryland beginning in October 2018. For purposes of this Complaint, the term "mortgage loans" refers to all loans that Trident and other creditors must report under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. §§ 2801-2810, and "mortgage lending" refers to providing those loans.

13.     Trident is a fully-owned subsidiary of Fox and Roach/Trident LP, which in turn is owned by HomeServices of America, Inc. The ultimate holding company of Trident is Berkshire

Hathaway, Inc.

14.     From 2015 through 2019, Trident originated mortgage loans secured by one- to four-family properties. Most of its mortgage volume during this time consisted of home purchase transactions, and it made some refinance mortgage loans.

15.     From 2015 through 2019, about 80% of Trident's mortgage loan application volume came from the Philadelphia MSA.

16.     Trident is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100, 12 C.F.R. pt. 1002.

17.     Trident is a "creditor" under ECOA, 15 U.S.C. § 1691a(e), and engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

18.     Trident is a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A), (15)(A)(i).

## FACTUAL ALLEGATIONS

19.     Trident has acted to meet the credit needs of majority-white neighborhoods while avoiding serving the credit needs of majority-minority and high-minority neighborhoods in the Philadelphia MSA. Trident's statements, acts, and practices directed at prospective applicants discouraged applications for credit for properties located in majority-minority and high-minority neighborhoods in the Philadelphia MSA.

20.     A "majority-minority" neighborhood or area comprises census tracts in which more than 50% of the residents reported their race and ethnicity in the U.S. Census as Black, Hispanic, Asian, Native American, Native Hawaiian, or Pacific Islander. A "high-minority" neighborhood or area comprises census tracts in which more than 80% of the residents reported

their race and ethnicity in the U.S. census as Black, Hispanic, Asian, Native American, Native Hawaiian, or Pacific Islander.

21.     The Philadelphia MSA comprises 11 counties in four states: New Castle County in Delaware; Cecil County in Maryland; Burlington County, Camden County, Gloucester County, and Salem County in New Jersey; and Bucks County, Chester County, Delaware County, Montgomery County, and Philadelphia County in Pennsylvania.

22.     As of 2019[1], the population of the Philadelphia MSA was 6,102,434, of which 20% were Black people (non-Hispanic), 10% were Hispanic people, 6% were Asian people, and 61% were non-Hispanic white people.

23.     The Philadelphia MSA comprises 1,464 residential census tracts of which 425 (29%) are majority-minority census tracts. Two-hundred and forty-seven (17%) of the tracts are high-minority as well as majority-minority. The population of the 425 majority-minority census tracts in the MSA is 53.2% Black people (non-Hispanic), 18.5% Hispanic people, 5.9% Asian people, and 19.4% non-Hispanic white people.

24.     These majority-minority and high-minority census tracts are concentrated in the Philadelphia Metropolitan Division (Philadelphia MD) and the Camden Metropolitan Division (Camden MD). Of the 425 majority-minority census tracts in the Philadelphia MSA, 279 (65.6%) are in the Philadelphia MD and 70 (16.5%) are in the Camden MD. Of the 247 high-minority census tracts in the Philadelphia MSA, 189 (76.5%) are in the Philadelphia MD and 39 (15.8%) are in the Camden MD.

25.     On November 19, 2020, the Bureau made a referral to the Department of Justice after concluding that Trident violated ECOA, 15 U.S.C. § 1691(a)(1), and Regulation B, 12

---

[1] All demographic data discussed in this Complaint is based on 2019 American Community Survey data from the United States Census Bureau.

C.F.R. § 1002.4(b), "by intentionally redlining minority neighborhoods in the Philadelphia MSA by engaging in acts or practices directed at prospective applicants that would discourage reasonable people on the basis of race or national origin from applying for credit."

26.     On January 27, 2021, the United States informed Trident that it had initiated an investigation into potential lending discrimination by Trident in violation of ECOA, 15 U.S.C. §§ 1691-1691f, and the FHA, 42 U.S.C. §§ 3601-3619.

27.     Trident represented that, as of April 8, 2021, it had discontinued mortgage origination operations and that its affiliate, Prosperity Home Mortgage, LLC (Prosperity), has taken over its lending operations. Prosperity employs or offered employment to almost all of Trident's former employees, took over Trident's offices that are co-located with its affiliate Fox and Roach LP (Fox & Roach), and continues, without interruption, to provide mortgage services to customers in the same manner that Trident provided mortgage services.

**Trident's Office Locations Were Concentrated in Majority-White Neighborhoods**

28.     Trident did not own or operate branches. Instead, Trident rented space in Fox & Roach's real estate offices.

29.     From 2015 through 2019, Trident's offices were located to serve the credit needs of residents in majority-white neighborhoods and to avoid serving the credit needs of residents in majority-minority and high-minority neighborhoods.

30.     From 2015 through 2019, Trident operated 53 offices, of which 51 were in majority-white neighborhoods. All those office locations could accept mortgage loan inquiries from prospective applicants and were prominently displayed on Trident's website. While 29% of the census tracts in the Philadelphia MSA are majority-minority, only two of Trident's offices during that time were in a majority-minority neighborhood. Moreover, despite the fact that 17%

of the census tracts in the Philadelphia MSA are high-minority, none of Trident's offices was in a high-minority area. *See* Exhibit A.

31.     Of the two offices in majority-minority areas, one was in an area that was 53% minority residents and one was in an area that was 52% minority residents.

32.     Of the 53 offices, 13 were in the Philadelphia MD and 10 were in the Camden MD, which are the two areas within the Philadelphia MSA that have the highest concentration of residents who identify as a minority and have the largest number of majority-minority and high-minority census tracts. Despite the high number of minority residents in the Philadelphia and Camden MDs, all 23 of these offices were in majority-white areas of the Philadelphia and Camden MDs.

33.     By concentrating nearly all its offices in majority-white areas, Trident discouraged residents of majority-minority areas from applying for and obtaining home loans from Trident and restricted their access to credit.

34.     From at least 2015 through 2019, Trident failed to take actions that would compensate for its lack of offices in majority-minority areas. For example, Trident did not assign any loan officers to solicit applications in majority-minority communities and failed to train or incentivize its almost exclusively white loan officers to lend in majority-minority areas.

### Trident's Mortgage Loan Officers Served Majority-White Neighborhoods but Not Majority-Minority Neighborhoods

35.     From at least 2015 through 2019, Trident's loan officers served the credit needs of majority-white neighborhoods but did not serve the credit needs of majority-minority neighborhoods.

36.     Trident relied primarily on its loan officers to generate loans and serve the credit needs of residents in the Philadelphia MSA.

37.     Each loan officer was assigned to work at a specific office location where they met with customers and took applications. As noted above, almost all the office locations were in majority-white areas. Trident did not direct loan officers to generate loans in portions of the Philadelphia MSA not immediately around the loan officer's assigned office. Trident did not direct or train its loan officers or other staff to take steps to serve the credit needs of majority-minority areas.

38.     From 2015 through 2019, Trident employed 68 mortgage loan officers in the Philadelphia MSA. Sixty-four of these 68 loan officers were white.

39.     The four non-white loan officers were Black; by 2018 Trident had terminated two of the Black loan officers.

40.     From 2015 through 2017, Trident employed 50 assistant loan officers. Of the 50 assistant loan officers, Trident maintained race and ethnicity information for 40: 36 (90%) were white people; one (2.5%) was a Black person; one (2.5%) was a Pacific Islander person; one (2.5%) was a Hispanic person; and one (2.5%) was an Arab American person.

41.     Images of Trident's loan officers and assistant loan officers were displayed on Trident's website.

42.     Trident hired new loan officers based on word of mouth and recommendations from its existing mostly white loan officers. The existing loan officers were experienced with serving, and had ties to referral sources largely in, majority-white areas. Trident did not make efforts to hire loan officers experienced with serving, or with ties to referral sources in, the majority-minority portions of the Philadelphia MSA. Trident maintained no formal policies or procedures for recruiting new mortgage loan officers.

**Trident's Marketing Targeted Majority-White Neighborhoods and Avoided Majority-Minority Neighborhoods**

43.     From 2015 through 2019, Trident's primary method of marketing was via relationships with Fox & Roach real estate agents. As noted above, Trident's offices were located in the Fox & Roach offices, which were overwhelmingly located in majority-white areas. Between at least January 2015 and May 2018, Trident made virtually no effort to market to residents of majority-minority neighborhoods.

44.     Although direct mailing was not Trident's primary form of marketing, when it did send direct mail advertising, the advertising was focused in majority-white areas. From January 2015 through May 2018, Trident conducted a total of 15 direct mail marketing campaigns. Over 92% of those direct mailings were sent to majority-white areas.

45.     Each of the direct mailing campaigns contained advertising material with images of exclusively white-appearing models, or white loan officers.

46.     From 2015 through 2019, Trident also advertised to prospective applicants with open-house flyers for properties listed by real estate agents. Trident loan officers provided the flyers via email or through hard copies to real estate agents for distribution at open houses attended by real estate agents, potential homebuyers, and prospective applicants. Similar to its direct mail advertising, over 90% of Trident's open house flyers were provided at open houses located in majority-white areas in the Philadelphia MSA.

47.     These flyers contained photos of Trident mortgage loan officers who were almost all white.

48.     The use of all white-appearing models and images of all white mortgage loan officers on Trident's marketing materials discouraged residents in majority- and high-minority neighborhoods, or those seeking credit in those neighborhoods, from seeking credit from Trident in the Philadelphia MSA.

49.    From 2015 through 2017, Trident used a third-party vendor to market to real estate agents, potential homebuyers, and prospective applicants using the Multiple Listing Service (MLS).

50.    Real estate agents working with Trident loan officers provided MLS listings for specific properties to potential homebuyers and prospective applicants. The third-party vendor generated Trident-specific brand marketing information on each selected MLS listing. The selected MLS listings were for properties that were overwhelmingly concentrated in majority-white areas (87.5%). Thus, only 12.5% of the selected MLS listings that included Trident advertising material were for properties in majority-minority census tracts, and only 5.8% of the selected listings were for properties located in high-minority census tracts.

51.    Trident's marketing efforts discouraged residents and prospective applicants in majority- and high-minority neighborhoods from seeking credit from Trident in the Philadelphia MSA.

**Racist or Discriminatory Emails and Photos Exchanged by Trident's Lending Staff**

52.    From at least 2016 through 2018, Trident loan officers sent and received emails via their Trident email accounts containing racial slurs and racist content, some of which indicated an intention to avoid lending in majority-minority neighborhoods.

53.    In several instances, loan officers or other Trident employees referred to properties in majority-minority areas as being in the "ghetto." For example:

      a.    A Trident mortgage loan officer emailed a Trident online lead coordinator regarding a consumer seeking prequalification, stating: "This one is in the ghetto. pass [sic] it along to ian. HAHAHAHAHHA kidding."

      b.    A Trident mortgage loan officer sent an email discussing a comparable

property that was used in an appraisal, stating: "This comps [sic] street is like

a ghetto and he knows it and if he doesn't that's even worse."

c.   A Trident senior loan officer emailed another loan officer, stating: "talked to

[agent].... He said to stay away from sears street, its [sic] upper ghetto

blocked off bad area just a heads up."

54.   On another occasion, a Trident assistant loan officer received a racist email

entitled "Being White, reminder" from a Fox & Roach employee. The Trident employee

forwarded that email to several others. Among other things, the email stated:

a.   "Proud to be White;"

b.   "You call me 'White boy', 'Cracker', 'Honkey', 'Whitey', 'Caveman'... And

that's OK... But when I call you Nigger, Kike, Towel head, Sandnigger,

Camel Jockey, Beaner, Gook, or Chink... You call me a racist."

c.   "You rob us, carjack us, and shoot at us. But, when a white police officer

shoots a black gang member or beats up a black drug dealer running from the

law and posing a threat to society, you call him a racist."

d.   "There is nothing improper about this email... But let's see which of you are

proud enough to send it on. I sadly don't think many will."

e.   "BE PROUD TO BE WHITE!"

55.   On another occasion, a Fox & Roach real estate agent forwarded an email to a

Trident loan officer, entitled: "YOU KNOW WHEN YOU'RE IN THE HOOD." The Trident

loan officer forwarded the message to several others. The email contained several racist images

and racial slurs, including:

a.   A picture of a wheelbarrow filled with watermelons with a sign on the

wheelbarrow that said, "Apply for a Credit Card Free Watermelon."

b.  A picture purporting to show a liquor store sign with the message "SORRY—CLOSED A NIGGER ROBBED US… AGAIN."

56.   On another occasion, a Fox & Roach real estate agent forwarded an email to a Trident loan officer and a Trident assistant loan officer with a subject line, "Quick Hide Kit For Illegals." The email contained a video entitled, "Wetback-Quick Hide." The video depicted a man hiding himself in an expandable metal tube.

57.   In 2019, Trident lending staff circulated a photo via email showing Trident's Senior Vice President and General Sales Manager, whose responsibilities included hiring and overseeing loan officers, posing with others in front of a Confederate flag. Upon learning of this photo, Trident took no disciplinary action against this Senior Vice President or the lending employees who circulated the photo.

### Trident's Market Area and its Disproportionately Low Numbers of Home Loan Applications from Majority-Minority and High-Minority Neighborhoods

58.   Trident's self-defined lending footprint included the entire Philadelphia MSA. Trident received 80% of its mortgage applications for properties located in that MSA. However, Trident's lending demonstrated a pattern of disproportionately serving those areas of the MSA that are majority-white.

59.   Trident's policies and practices alleged herein—including the concentration of nearly all its offices, loan officers, marketing, and outreach in majority-white neighborhoods—have discriminated against and discouraged applicants and prospective applicants in majority-minority neighborhoods and high-minority neighborhoods in the Philadelphia MSA from applying for and obtaining home loans and other mortgage-related services. *See* Exhibits B and C.

60.     Trident's own data on loan applications and originations, that it is required to report to regulators under HMDA, 12 U.S.C. §§ 2801-2811, confirms that Trident avoided serving majority-minority neighborhoods and high-minority neighborhoods in the Philadelphia MSA.

61.     From 2015 through 2019, Trident significantly underperformed its "peer lenders" in generating home mortgage applications from majority-minority neighborhoods in the Philadelphia MSA.

62.     The disparity between the rate of applications generated by Trident and the rate generated by its peer lenders from majority-minority neighborhoods and high-minority neighborhoods was both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2015 through 2019.

63.     Specifically, of the 30,701 HMDA-reportable mortgage applications Trident generated for single-family dwellings from 2015 through 2019 in the Philadelphia MSA, 12% came from residents of majority-minority areas. By contrast, Trident's peers generated 21.5% of their 134,901 applications from these same majority-minority neighborhoods. These disparities are statistically significant across the five-year period and in every year analyzed.

64.     The disparity was even greater in high-minority neighborhoods. While 4.1% of Trident's applications came from high-minority areas, 10.8% of the peers' applications came from the same high-minority areas. These disparities are statistically significant across the five-year period and in every year analyzed.

65.     In other words, from 2015 through 2019, Trident's peer lenders generated applications from high-minority areas at more than two-and-a-half times the rate of Trident.

66.     Even when Trident generated applications from majority-minority and high-

minority areas, the applicants themselves were disproportionately white. In high-minority census tracts, although less than 20% of the population was white, 51% of the applications from those who identified their race came from white applicants. In majority-minority census tracts, 56.2% were from white applicants.

67.     The statistically significant disparities between applications Trident generated from majority-minority and high-minority neighborhoods and those that its peers generated show that there were significant numbers of residents in majority-minority and high-minority areas in Philadelphia who were seeking home loans. Trident had no legitimate, non-discriminatory reason to draw so few applications from these areas.

68.     This data shows a statistically significant failure by Trident to draw applications for home loans and provide residential mortgage services to residents in majority-minority and high-minority neighborhoods on a non-discriminatory basis when compared with similarly situated lenders from 2015 through 2019.

**Disproportionately Low Numbers of Home Loans Made in Majority-Minority and High-Minority Neighborhoods**

69.     From 2015 through 2019, Trident significantly underperformed its peer lenders in making home loans in majority-minority neighborhoods in the Philadelphia MSA.

70.     The disparity between the rate of home loans that Trident made and the rate made by its peer lenders in majority-minority neighborhoods and high-minority neighborhoods was both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2015 through 2019.

71.     Specifically, of the 22,960 HMDA-reportable loans Trident made for single-family dwellings from 2015 through 2019 in the Philadelphia MSA, 11.7% came from residents of majority-minority areas. By contrast, Trident's peers made 16.2% of their 50,060 loans from

these same majority-minority neighborhoods.

72.      These disparities are statistically significant across the five-year period and in every year analyzed.

73.      The disparity persists in high-minority neighborhoods. While 3.7% of Trident's loans were made in high-minority areas, 6.9% of the peers' loans were made in these same high-minority areas. These disparities are statistically significant across the five-year period and in every year analyzed.

74.      In other words, from 2015 through 2019, Trident's peer lenders made loans in high-minority areas at close to twice the rate of Trident.

75.      Even when Trident made loans in majority-minority and high-minority areas, the loans themselves were disproportionately made to white borrowers. In high-minority census tracts, although only 20% of the population was white, 38.5% of the loans to those who identified their race were made to white borrowers. In majority-minority census tracts, 57.7% were made to white borrowers.

76.      The statistically significant disparities between loans Trident made in majority-minority and high-minority neighborhoods and those that its peers made show that there were residents in majority-minority and high-minority areas in Philadelphia who were seeking and qualified for home loans. Trident had no legitimate, non-discriminatory reason to originate so few loans from these areas.

77.      This data shows a statistically significant failure by Trident to make home loans and provide residential mortgage services to residents in majority-minority and high-minority neighborhoods on a non-discriminatory basis when compared with similarly situated lenders from 2015 through 2019.

**Trident's Intentional Failure to Improve its Lending to Black and Hispanic Applicants and Prospective Applicants and in Majority-Minority Communities**

78.     Beginning in September 2015, Trident was aware that its operations were creating a risk of violating fair lending laws. Between September 2015 and April 2018, Trident received at least six separate reports from third-party vendors engaged to report on Trident's fair lending performance. These reports consistently informed Trident that its application volume from Black and Hispanic potential borrowers, as well as for properties in high-minority and majority-minority neighborhoods, was low relative to both the overall population and to the performance of its peers.

79.     Before the Bureau informed Trident that it would be subject to a fair lending examination, Trident took no meaningful action in response to these analyses indicating that it was underserving Black and Hispanic borrowers and majority-minority neighborhoods, despite having knowledge of its underperformance and its redlining risk.

80.     The totality of Trident's acts, policies, and practices described herein constitute unlawful discouragement and redlining of majority-minority and high-minority neighborhoods in the Philadelphia MSA.

81.     From 2015 through at least 2019, Trident engaged in acts or practices that, together and separately, discriminated against applicants and prospective applicants on the basis of the race, color, or national origin of the residents of majority-minority neighborhoods in the Philadelphia MSA, including by redlining and discouraging them from seeking or obtaining credit from Trident.

82.     Trident's discriminatory practices as described herein were intended to discriminate and discourage, and had the effect of discriminating and discouraging, on the basis of race, color, or national origin.

17

## COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT
### (By the United States of America)

83.     The United States incorporates all prior Paragraphs of the Complaint as if fully set forth herein.

84.     Trident's policies and practices constitute the unlawful redlining of majority-minority communities in the Philadelphia MSA on account of the racial, color, and national origin composition of those communities. Trident's policies and practices were intended to deny, and had the effect of denying, equal access to home loans to residents of majority-minority communities and those seeking credit for properties located in those communities. Trident's conduct was not justified by business necessity or legitimate business considerations.

85.     Trident's actions as alleged herein constitute:

a.  Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulation, 24 C.F.R. §§ 100.110(b), 100.120;

b.  The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulation, 24 C.F.R. § 100.50(b)(3); and

c.  Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulation, 24 C.F.R. §§ 100.50(b)(2), 100.65.

86.     Trident's policies and practices as alleged herein constitute:

a.   A pattern or practice of resistance to the full enjoyment of rights secured by
     the FHA; and

b.   A denial of rights granted by the FHA to a group of persons that raises an
     issue of general importance.

87.     Trident's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

88.     Persons who have been victims of Trident's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of the Trident's conduct in violation of the Fair Housing Act, as described above.

### COUNT II: VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT
### (By the United States of America and the Consumer Financial Protection Bureau)

89.     The Plaintiffs incorporate all prior paragraphs of the Complaint as if fully set forth herein.

90.     Trident's acts, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-minority communities in the Philadelphia MSA and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, or national origin in violation of ECOA and Regulation B. 15 U.S.C. § 1691 et seq.; 12 C.F.R. § 1002.4(a)-(b).

91.     Trident's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of ECOA. 15 U.S.C. § 1691e(h).

92.     Trident's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

93.     Persons who have been victims of Trident's discriminatory policies and practices are "aggrieved" as defined in 15 U.S.C. § 1691e(i), and may have suffered damages as a result of the Trident's conduct in violation of the Equal Credit Opportunity Act, as described above.

### COUNT III: VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT
#### (By the Consumer Financial Protection Bureau)

94.     The Bureau incorporates all prior Paragraphs of the Complaint as if fully set forth herein.

95.     Section 1036(a)(1)(A) of the CFPA prohibits a covered person from offering or providing to a consumer any financial product or service not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

96.     The Equal Credit Opportunity Act is a federal consumer financial law. 12 U.S.C. §§ 5481(12)(D), 5481(14).

97.     Trident's ECOA violations, described above in Count II, constitute violations of Section 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A); 15 U.S.C. § 1691c(b).

### DEMAND FOR RELIEF

The United States and the Bureau request that the Court enter an order that:

(1)     Declares that Trident's acts and practices violate the FHA. 42 U.S.C. §§ 3601-3619;

(2)     Declares that Trident's acts and practices violate ECOA. 15 U.S.C. §§ 1691-1691f;

(3)     Enjoins Trident, its agents, employees, successors, and all others in active concert or participation with Trident, from:

      A.     Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

      B.     Discouraging applicants or prospective applicants on account of race, color, or national origin;

      C.     Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct; and

      D.     Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all segments of Defendant's market areas are served without regard to prohibited characteristics;

(4)     Awards damages, restitution, equitable, and other monetary relief, under 42 U.S.C. § 3614(d)(1)(B); 15 U.S.C. §§ 1691c(a)(9), 1691e(h); and 12 U.S.C. § 5565;

(5)     Assesses a civil money penalty against Trident in an amount authorized by 12 U.S.C. § 5565(c) and 42 U.S.C. § 3614(d)(1)(C);

(6)     Awards to the Plaintiffs the costs of bringing this action; and

(7)     Awards to the Plaintiffs such additional relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States and the Bureau demand trial by jury in this action on all issues so triable.


Dated: July 27, 2022                             Respectfully submitted,

FOR THE CONSUMER FINANCIAL PROTECTION BUREAU:

ERIC HALPERIN
Enforcement Director

DEBORAH MORRIS
Deputy Enforcement Director

*/s/ Rebeccah Golubock Watson*
REBECCAH GOLUBOCK WATSON
(DC #989313)
CHELSEA PETER
*Enforcement Attorneys*
Consumer Finance Protection Bureau
1700 G Street NW
Washington, DC 20552
Telephone: (202) 435-7895
Rebeccah.Watson@cfpb.gov
Chelsea.Peter@cfpb.gov

FOR THE UNITED STATES:

*/s/ Jacqueline C. Romero*
JACQUELINE C. ROMERO
United States Attorney
Eastern District of Pennsylvania

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SAMEENA SHINA MAJEED
Chief

LUCY G. CARLSON
Deputy Chief

GERALD B. SULLIVAN
Assistant United States Attorney
615 Chester Street, Suite 1250
Philadelphia, PA 19106
Phone: (215) 861-8786
Fax: (215) 861-8618
Gerald.Sullivan@usdoj.gov

*/s/ Sara L. Niles*
SARA L. NILES
*/s/ Abigail A. Nurse*
ABIGAIL A. NURSE
*/s/ Jennifer A. Slagle Peck*
JENNIFER A. SLAGLE PECK
Trial Attorneys
Housing & Civil Enforcement Section
950 Pennsylvania Ave. NW – 4CON
Washington, DC 20530
Phone: (202) 514-4713
Fax: (202) 514-1116
Sara.Niles@usdoj.gov
Abigail.Nurse@usdoj.gov
Jennifer.Slagle.Peck@usdoj.gov